PROVEN METHODS SEMINARS, LLC, a Nevada limited liability company; and Proven Methods Customer Service, LLC, a Nevada limited liability company, doing business together as National Grants Conferences, Plaintiffs,

v.

AMERICAN GRANTS & AFFORDABLE HOUSING INSTITUTE, LLC, a Texas limited liability company; Best News Realty, LLC, a Texas limited liability company; Coast–to–Coast Marketing, LLC, a Texas limited liability company; John T. Polk; Patrick Farah; William Pappas, Kaleb Forrest; Rene Gonzalez; Michelle Harmon; Lewis Curry; Tiffany Barnes; Scott Voelkel; Steve Wyman; Steve Wollaston; Gus Fernandez; Donald Harkema; Nancy Devaughn; Jack Marlando; Dawn Lane; and Bruce West, Jr., Defendants.

No. CIV. S–07–01588 WBS EFB.

United States District Court,
E.D. California.

Sept. 18, 2007.

Eric B. Carlson, Larry C. Russ, Robert E. Satterthwaite, Russ August & Kabat, Los Angeles, CA, James Joseph Banks, Banks & Watson, Sacramento, CA, for Plaintiffs.

Andrew W. Stroud, Mennemeier Glassman and Stroud, Sacramento, CA, for Defendants.

## ORDER RE: MOTION FOR PRELIMINARY INJUNCTION

WILLIAM B. SHUBB, District Judge.

Plaintiffs Proven Methods Seminars, LLC, and Proven Methods Customer Service, LLC, (collectively "plaintiffs")

brought this action alleging copyright and trademark infringement against defendants American Grants & Affordable Housing Institute ("defendants"). Plaintiffs now move for a preliminary injunction against defendants' continued use of the allegedly infringing materials and mark.

## I. *Factual and Procedural Background*

In March of 1998, plaintiffs created a nationwide program that provides information to its customers about the various government grant, loan, and subsidy programs available to buy their first home, invest in real estate, or start/expand businesses. (Orlando Decl. ¶¶ 1–3.) Plaintiffs use "National Grants Conferences" as its trade name and service mark, promoting its program under that mark, including on its website ("www.nationalgrants.com"). (*Id.* ¶¶ 4–5.) Further program promotion is conducted in markets across the country via a series of free two-hour introductory seminars. (*Id.*) Following each seminar, plaintiffs offer for sale the program's membership package, i.e. a series of products and services that includes extensive reference materials covering current assistance programs offered by local and federal governments. (*Id.*)

Defendants, formed in May of 2007, are also involved in providing customers with information about how to obtain loans, grants, and subsidies from government agencies. (West Decl. ¶ 2.) Defendants actively promote their own business under the corporate heading, "American Grants & Affordable Housing Institute," and conduct information seminars across the country. (*Id.*) Like plaintiffs' business model, defendants follow these seminars with a sales pitch aimed at increasing its consumer base and selling various products and customer support services. (Orlando Decl. ¶ 20.)

On August 3, 2007, plaintiffs filed this action based on similarities regarding the companies' seminars and services, as well as defendants' use of the "American Grants & Affordable Housing" mark.[1] Specifically, the complaint alleges eleven causes of action: 1) copyright infringement (17 U.S.C. § 101 *et seq.*); 2) trademark infringement (15 U.S.C. § 1114 *et seq.*); 3) unfair competition/false advertising (15 U.S.C. § 1125(a)(1)); 4) unfair competition/likelihood of confusion (15 U.S.C. § 1125(a)(1)); 5) intentional interference with contractual relations; 6) intentional interference with prospective economic advantage; 7) conversion; 8) theft of trade secrets; 9) unfair competition (Cal. Bus. & Prof.Code § 17200 *et seq.*); 10) breach of contract; and 11) conspiracy and aiding and abetting. Plaintiffs now ask this court to enjoin Defendants from any and all continued use of any plaintiffs' copyrighted material and the "American Grants & Affordable Housing Institute" mark.

## II. *Discussion*

The legal principles applicable to a request for preliminary injunctive relief are well established. "To obtain a preliminary injunction, the moving party must demonstrate either (1) probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships sharply favors the moving party. These are not separate tests, but are the ends of a continuum; the greater the relative hardship to the moving party, the less probability of success must be shown." *Nat'l Ctr. for Immigrants Rights, Inc. v. I.N.S.*, 743

---

1. Plaintiffs submitted an amended complaint on September 12, 2007 in which they contend that their copyright materials were properly registered. In all other respects, the amended complaint is virtually identical to the original.

F.2d 1365, 1369 (9th Cir.1984) (internal citations omitted).

■ In the context of copyright and trademark claims, however, the Ninth Circuit has recognized a broad presumption that irreparable harm exists if a plaintiff is able to demonstrate a likelihood of success on the merits. *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir.1999) ("Under federal copyright law ... a plaintiff that demonstrates a likelihood of success on the merits of a copyright infringement claim is entitled to a presumption of irreparable harm."); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1066 (9th Cir.1999) (noting that in trademark law, "irreparable injury may be presumed from a showing of likelihood of success on the merits of a trademark infringement claim") (citing *Metro Pub., Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir.1993)). Thus, both the copyright and trademark inquiries each effectively conflate the two prongs "into a single question of whether the plaintiff is able to show a likelihood of success on the merits." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 n. 4 (9th Cir.2000) (referencing trademarks); *see also Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1109 (stating that party seeking preliminary injunctive relief on the basis of copyright infringement need only show a likelihood of success on the merits).

### A. Copyright Claims

#### 1. Jurisdiction

■ Before considering the likelihood that plaintiffs will succeed on the merits of their copyright infringement claim, the court must determine whether it has subject matter jurisdiction over the claim.

Section 411 of the Copyright Act of 1976 provides that "no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). *See Dielsi v. Falk*, 916 F.Supp. 985, 994 (C.D.Cal. 1996) ("Plaintiff's failure to plead that he has applied for a copyright registration deprives this court of subject matter jurisdiction over his copyright claim"); *Conan Props. v. Mattel, Inc.*, 601 F.Supp. 1179, 1182 (S.D.N.Y.1984) ("In order to proceed in its copyright infringement action, plaintiff is required to comply with the statutory requirement that all copyrights be registered").

In its initial complaint, plaintiffs failed to plead that registration or even pre-registration of their copyrights in the contested materials had occurred. After the oversight was brought to their attention, plaintiffs immediately filed applications, deposits, and fees for the copyrighted material with the U.S. Copyright Office. When the Copyright Office issued the registration certificates on September 10, 2007, plaintiffs properly filed an amended complaint to reflect issuance of these certificates.[2] In *Zito v. Steeplechase Films, Inc.*, 267 F. Supp 2d 1022 (N.D.Cal.2003), the court held that submission of an amended complaint will sufficiently redress any jurisdictional qualm. *Id.* At 1205 (holding that despite plaintiff's failure to register his work with the Copyright Office *before* filing his complaint, "dismissal is not called for since plaintiff cured this defect by registering his copyrighted photograph and filing an amended complaint"). Here, it follows that plaintiffs' original failure to allege registration is cured by the amended complaint, which now includes allegations that the copyrighted works are in

2. "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served." Fed. R.Civ.P. 15(a).

fact registered.[3] *See id.; Demetriades v. Kaufmann,* 680 F.Supp. 658, 661 (S.D.N.Y. 1988) (confirming proper jurisdictional basis upon plaintiff's submission of amended complaint alleging issuance of a valid copyright certificate). Accordingly, the court finds that plaintiffs have complied with the 17 U.S.C. § 411(a)and the court has subject matter jurisdiction.

### 2. *Success on the Merits*

■ To succeed on the merits of their copyright infringement claim, plaintiffs must show (1) ownership of valid copyrights in the allegedly infringed material, and (2) copying of protected expression by defendants. *Triad Sys. Corp. v. Southeastern Express Co.,* 64 F.3d 1330, 1335 (9th Cir.1995).

### a. *Ownership of Copyrights*

A copyright registration certificate is prima facie evidence of copyright ownership. *See* 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."). Plaintiffs have presented copies of registration certificates covering (1) "Cashing in on Government Grants, Loans, and Subsidies," Volumes I and II (collectively, the "Brown Books"); (2) "The Complete Directory and Cross Reference to Federal, State and Local Grants, Loans and Subsidies" (the "Red Books"); and (3) Plaintiffs' one-page "'Summary of Services' for Members." (First Am. Compl. ¶ 1.)

Defendants do not dispute the copyright status of the Red Books or the Summary of Services page, but maintain that the proof of registration does not suffice in relation to the Brown Books. (Defs' Opp. at 9: 25–26) Specifically, defendants point out that the copyright notice in the Brown Books list "C–Right Holdings, Inc." (CRH, Inc.) as holders of the copyright, *id.* at 9: 27–28, and that there is no evidence that CRH Inc. ever transferred or assigned its rights to the works to plaintiffs. *Id.* at 10: 7–8. However, it is undisputed that CRH Inc. is a common law general partnership and "alter ego" formed by the principals of plaintiffs. (Orlando Decl. ¶ 20 n. 1.) Moreover, like the Red Books and Summary of Services page, the Brown Books' actual copyright registration certificate is issued to "Plaintiffs Seminars, LLC." (Gross 2d Supp. Decl. Exhibit D.)

Defendants also note that the Brown Books' application for copyright registration does not list the materials as "work[s] made for hire." (Defs' Opp. at 10: 21–23) Therefore, defendants reason, the Brown Books are actually owned by Deborah Rice, assumed to be the original author, and not Plaintiffs. *Id.* at 10: 23–24; *cf. Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (noting that if an author creates a "work-made-for-hire," then it is assumed that the company or person that

**3.** Defendants rely on the Ninth Circuit's decision in *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization,* 858 F.2d 1376 (9th Cir.1988), a non-copyright case where the court held that an interpleader would have federal question jurisdiction only if it would have existed in a coercive action by defendant. *Id.* at 1385–86. Because the defendant's well-pleaded complaints all arose under state law and there was no diversity of citizenship, the court found that the plaintiff in the interpleader action could not force federal subject matter jurisdiction by amending its complaint to include federal claims that would not have been part of the defendant's well-pleaded complaints. *Id.* In contrast, the instant action is both grounded in federal claims and directly analogous to the aforementioned copyright amendment cases recognizing jurisdiction.

hired the author to create the work owns the copyright instead). In response, plaintiffs assert this was a typographical error in the application, and that Rice was a work-for-hire when she purportedly authored the Brown Books. (Gross 2d Supp Decl. ¶ 5.)

■ It is well-accepted that such an error of this ilk should not invalidate copyright registration. *See Cooling Sys. & Flexibles v. Stuart Radiator*, 777 F.2d 485, 487 (9th Cir.1985) ("Absent fraud, 'a misstatement or clerical error in the registration application ... will not invalidate the copyright nor render the registration certificate incapable of supporting an infringement action.' ") (quoting 2 M. Nimmer, *Nimmer on Copyright* § 7.20, at 7–147 (1985)). Moreover, it is undisputed that Rice created the original Brown Books in her capacity as a work-for-hire. (Rice Decl. ¶ 1.) For this reason alone, the copyright in the Brown Books—like those of the Red Books and the Summary of Services page—belongs to Plaintiffs. *See Real Estate Data, Inc. v. Sidwell Co.*, 907 F.2d 770, 771 (7th Cir.1990) ("Under the work for hire doctrine ... the County, as the employer of Sidwell, was presumed to be the owner of the copyright with the burden on Sidwell to demonstrate a contrary intention."). Thus, plaintiffs are the proper owners of the relevant copyrights.

b. *Copying of Protected Expression*

■ After providing proof of ownership, a claimant must show (a) that its materials indeed possess protectable expression, and (b) that the alleged infringer actually copied this expression. *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 206 (9th Cir.1988). Copyright protection is available for "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). Copyright protection does not, however, "extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery ...." 17 U.S.C. § 102(b). Thus, the originality requirement mandates that objective "facts" and "ideas" are not copyrightable. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 347, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1109–10 (9th Cir.1970). However, "factual compilations" may possess the requisite originality because compilation authors typically choose which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. *Feist*, 499 U.S. at 348, 111 S.Ct. 1282. If the selection and arrangement of the facts are made independently by the compiler and entail a minimal degree of creativity, they qualify for copyright protection. *See id.* ("[E]ven a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement.").

■ The *first* inquiry is whether any or all of plaintiffs' works possess the minimum level of creativity necessary to establish copyright protection. The Brown Books are compilations of facts and information taken from various websites and other source material. While much of the information represented in the Brown Books is taken from the public domain, the Books themselves portray this information in an intentionally scaled-down manner. Further, the material is combined with opinions and suggestions that represent significant judgment, discretion, and originality on the part of its author. (Rice Decl. ¶ 5.) The final product is a user-

friendly "How–To" guide to navigating the various government programs.

■ Likewise, plaintiffs' Red Books are compilations of facts, e.g. general organizational and contact information for governmental programs available in certain geographic locales. While the degree of originality is less here than with the Brown Books—plaintiffs simply organize the Red Books according to a top-down infrastructure that reflects the inherent makeup of the grant and funding programs—its personnel nonetheless utilize more-than-trivial discretion in deciding exactly what information to include as well as how to arrange it within each tier. (Stork Decl. ¶ 10.; Orlando Decl. ¶ 23.) Therefore, both the Brown Books and the Red Books are afforded copyright protection.

■ However, plaintiffs have not provided significant evidence of creativity to warrant protection for their Summary of Services page.[4] Indeed, the page is simply a garden-variety, mechanical outline of its program. *See Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 674, 683–89 (2d Cir.1998) (holding that enhancements such as shortening the form of titles, capitalizing letters, providing subsequent case history and other garden-variety additions are not copyrightable because they miss the creative spark); *Spilman v. Mosby–Yearbook, Inc.*, 115 F.Supp.2d 148, 154–55 (D.Mass.2000) (finding that trivial aesthetics such as a table of contents do not have sufficient creativity to be protected under copyright law).

■ *Second,* in order to prove copying of their protected expression, plaintiffs must establish that defendants "had 'access' to plaintiff[s'] work and that the two works are 'substantially similar.' " *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir.2000). Because defendants admit they had access to plaintiffs' works,[5] this court need only focus on the similarities between the two parties' materials.

■ Copyright protection of factual compilations is "thin," and a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work so long as the competing work does not feature the same selection and arrangement. *Feist,* 499 U.S. at 349, 111 S.Ct. 1282. In such cases, plaintiffs must demonstrate "verbatim reproduction or very close paraphrasing before a factual work will be deemed infringed." *Landsberg v. Scrabble Crossword Game Players*, 736 F.2d 485, 488 (9th Cir. 1984) (alleged infringer's Scrabble game-strategy book contained no more similarity than what must have been produced by anyone wishing to restate the unprotectable ideas in plaintiff's book).

After a comparison of plaintiffs' Brown Books with defendants' analogous material, it is evident that defendants have infringed on plaintiffs' copyright in the Brown Books. The Brown Books, more so than any of plaintiffs' submitted exhibits, display ample amounts of creativity and originality. Evidence and research shows that its original author, Deborah Rice, took public domain material and then thoroughly condensed and rearranged it, all the while managing to insert inventive goal-setting checklists as well as original, nuanced suggestions for fledgling investors.

---

**4.** Plaintiffs choose not to sufficiently develop this argument; nor can they prove, inter alia, that defendants's own "Summary of Member Services" page—which describes their own services differently and lists them in a distinct order—sufficiently copies plaintiffs' page.

**5.** "[Defendants] do[ ] not deny that it had access to [p]laintiffs' materials and that those materials were taken into consideration when [defendants] drafted its own materials." (Def.'s Mem. Opp. Prelim. Inj. 14: n.8)

Even a cursory glance at both parties' materials demonstrates that defendants substantially duplicate Rice's selection and arrangement. Defendants' material includes substantial replication as well as "makes a very close paraphrasing" of Rice's copyrighted expression. *Id.*

▮ In contrast, plaintiffs are unable to demonstrate that defendants have infringed on the copyright in the Red Books. This copyright relies wholly on selection and arrangement and is void of additional originality. Further, the creativity of the Red Books selection and arrangement—which reflects the inherent top-down infrastructure of the grant and funding programs—is exceedingly minimal, entitling plaintiffs to only the thinnest of copyright protection. Unlike the Brown Books, where selection and arrangement was enhanced by overt and idiosyncratic choices that defendants could not have found in the public domain (yet which appear in its materials nearly word-for-word), it is undisputed that the structure of the Red Books aligns with facts and ideas that emanate from the public domain. Thus, absent any wholesale or verbatim instances of copying in regards to plaintiffs' explicit selection and arrangement, there is no infringement of the Red Books. *See Satava v. Lowry,* 323 F.3d 805, 812 (9th Cir.2003) (noting that while plaintiff added some original variations that can earn copyright protection, this protection is "thin" and only allows plaintiff to "prevent others from copying the original features he contributed").[6]

▮ Because Plaintiffs have demonstrated a likelihood of success on the merits as to infringement of the Brown Books, irreparable harm is hereby presumed. *Sun Microsystems,* 188 F.3d at 1119. With regard to the Red Books and Summary of Services page, plaintiffs are unable to demonstrate a likelihood of success on the merits. Further, the court is not persuaded by plaintiffs' assertion of irreparable harm as it relates to the latter materials.[7] Accordingly, the court will grant plaintiffs' motion in part and deny it in part.

### B. Trademark Claim

▮ A successful trademark infringement claim requires a showing that the claimant holds a protectable mark and that the alleged infringer's imitating mark is similar enough to "cause confusion, or to cause mistake, or to deceive." *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 117, 125 S.Ct. 542, 160 L.Ed.2d 440, (2004). Plaintiffs claim that their trademark, "National Grants Conferences," is infringed by Defendants' mark, "American Grants & Affordable Housing."

#### 1. Protectable Mark

▮ The purported trademark holder bears the ultimate burden of proof as to trademark validity in an infringement action. *Yellow Cab Co. v. Yellow Cab of Elk Grove, Inc.,* 419 F.3d 925, 928 (9th Cir.2005) (citing *Tie Tech, Inc. v. Kine-*

---

6. Should a competing business decided to hire a marketing firm to research material in the public domain in order to put together a directory of government grant and loan programs, it is inevitable that its directory would, in some capacity, mirror the Red Books. In fact, Defendants asserts they did exactly that when they put together its directory. (Walter Decl. ¶ 2.)

7. In fact, a balance of the hardships would decidedly favor defendants, a fledgling company that would be forced to cancel scheduled conferences and lose untold profit while incurring ongoing liabilities. (West Decl. ¶ 4.)

*dyne Corp.,* 296 F.3d 778, 783 (9th Cir. 2002)). Federal registration of a mark constitutes prima facie evidence of its validity, thus serving as a burden shifting mechanism. 15 U.S.C. § 1057(b); *Filipino Yellow Pages, Inc. v. Asian Journal Publs., Inc.,* 198 F.3d 1143, 1146 (9th Cir. 1999). Because it is undisputed that plaintiffs hold a registered trademark in "National Grants Conferences," the burden effectively shifts to defendants to prove that the mark is invalid. Defendants, in turn, contend that the registered mark is generic and thus not accorded protection. A generic mark is one that refers, or has come to be understood as referring, to the genus of which the particular product or service is a species. *Surgicenters of America, Inc. v. Medical Dental Surgeries Co.,* 601 F.2d 1011, 1014–15 (9th Cir.1979). A party seeking to void a registered trademark on grounds that it is generic must overcome the presumption of validity by a preponderance of the evidence. *Anti–Monopoly, Inc. v. General Mills Fun Group, Inc.,* 684 F.2d 1316, 1319 (9th Cir.1982). If shown to be generic, such a mark cannot become a valid trademark under any circumstances. *Id.* In determining whether a mark in generic, the Ninth Circuit has often relied on the "who are you—what are you" test, where a valid mark answers the buyer's questions "Who are you? Where do you come from?" "Who vouches for you?" *U.S. Jaycees v. San Francisco Jr. Chamber of Commerce,* 513 F.2d 1226, 1229 (9th Cir.1975). In contrast, a generic name answers the question "What are you?" *Id.*

The "National Grants Conferences" program is an interactive organization that includes not only seminars but also provides its members with one-on-one consulting, reviews and critiques of business plans and grant applications, website access, a toll-free contact number, etc. (Orlando Decl., ¶ 6.) Moreover, the program's services do not focus exclusively on federal grants but also state and local grant programs as well. Thus, the name "National Grants Conferences" is not the generic name for this category of goods and services, or for its producer, but rather a mark that connotes a unique service that plaintiffs supply their customers—i.e. "who" plaintiffs are. In fact, it is not difficult to imagine another term of reasonable conciseness and clarity by which the public could refer to these goods and services. *See Comm. for Idaho's High Desert, Inc. v. Yost,* 92 F.3d 814, 822 (9th Cir.1996) (finding that "Committee for Idaho's High Desert" was not generic where the name for the genus to which its particular desert preservation services belong would probably be "environmental education and advocacy"). Because defendants are unlikely to meet their burden by a preponderance of the evidence, the court finds, for purposes of this motion, that plaintiffs' mark is valid.

### 2. *Likelihood of Confusion*

A likelihood of confusion exists "when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." *Nutri/System, Inc. v. Con–Stan Indus., Inc.,* 809 F.2d 601, 604 (9th Cir.1987). In *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir.1979), the Ninth Circuit listed eight factors to be considered as part of the consumer confusion inquiry. *Id.* at 348–349. The *Sleekcraft* factors are: (1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the relatedness or proximity of the goods; (4) the marketing channels used by each party; (5) the degree of care likely to be exercised by the purchaser; (6) the defendant's intent in selecting the mark; (7) evidence of actual

confusion; and (8) the likelihood of expansion of the parties product lines. *Id.* This list of factors is not exhaustive—the test is a very pliant one, depending on the circumstances of each specific case. *Id.* at 348 n. 11; *Brookfield Communs. v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1054 (9th Cir.1999).

### a. *Similarity of the Marks*

■ "The first *Sleekcraft* factor—the similarity of the marks—has always been considered a critical question in the likelihood-of-confusion analysis." *GoTo.com,* 202 F.3d at 1205. To determine the similarity of marks, "first the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound and meaning; and third, similarities weighed more heavily than differences." *Id.* (citations omitted).

■ Plaintiffs' mark appears in the marketplace as "National Grants Conferences," while defendants use the mark "American Grants & Affordable Housing Institute." However, plaintiffs focus only on the first two words of each party's mark throughout its argument, continuously referring to its program (and themselves, for that matter) as simply "National Grants" and its adversary's mark as "American Grants." The Ninth Circuit dictates "that marks must be considered in their entirety." *Id.* By trimming defendants's mark down from six words to two—not to mention leaving off "Conferences" in connection with their own mark—plaintiffs' argument ignores applicable precedent. Further, plaintiffs arguments that defendants accentuate the "American Grants" font/type in relation to the latter " & Affordable Housing Institute" on selected materials or that a speaker at one of defendants' events referred to the program as "American Grants" lack merit. In actuality, the truncated term "American Grants" appears nowhere in any of the material that plaintiffs have filed with the court; rather, the reference is always to "American Grants & Affordable Housing Institute" or its acronym, "AGAHI."

Plaintiffs also focus on the similarity between "National" and "American," asserting that they are confusingly similar because the "meaning" is identical. (Pl.'s Mem. Supp. Prelim. Inj. 17: 8–9) As defendants point out, however, the terms "National" and "American" are commonly employed to differentiate programs or entities engaged in similar forums or business ventures.[8] Thus, the very words that plaintiffs highlight have been instituted in efforts to help others differentiate one entity from another when both maintain similar functions in the very same market.

When viewed in their entirety, the marks are not sufficiently similar.

### b. *Strength of the Mark*

■ The strength of a mark is determined by its placement on a continuum of increasing distinctiveness: (1) generic (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). A generic mark is inherently the weakest and is not afforded protection; a merely descriptive mark specifically describes a characteristic or ingredient of an

---

**8.** A non-exhaustive list of examples includes the National Broadcasting Company (NBC) and the American Broadcasting Company (ABC) in television programming; the American League (AL) and the National League (NL) in Major League Baseball; and, during the mid-twentieth century, the American Football League (AFL) and the National Football League (NFL) in professional football.

article or service and is protectable if it acquires a secondary meaning (i.e., becoming distinctive of the applicant's goods); a suggestive mark suggests rather than describes an ingredient, quality, or characteristic requiring imagination, thought, and perception to determine the nature of the goods; and an arbitrary or fanciful mark receives the strongest protection because it is usually a word or words invented solely for use as a trademark. *Surgicenters*, 601 F.2d at 1014–15.

■ Notwithstanding the court's conclusion that plaintiffs indeed hold a valid trademark in "National Grants Conferencing," the mark is stationed on the weak side of the continuum. The mark either fits into the "suggestive" category because it requires one to presume the nature of the program or services, or possibly the "descriptive" category in that it references some of the characteristics of plaintiffs' program that render it distinctive. Given plaintiffs' investment and goodwill/consumer recognition, the former assessment is likely but still underwhelming. Accordingly, the strength of plaintiffs' mark is average-to-weak.

### c. *Proximity of the Goods*

Where the goods bearing the two marks at issue are related, there is a concern that consumers will be confused as to the producer of the goods. *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir.1993). Here, it is undisputed that the services provided by defendants are virtually identical to those provided by plaintiffs. Thus, this factor weighs in favor of plaintiffs.

### d. *Marketing Channels Used by Both Parties*

The Ninth Circuit has determined that "convergent marketing channels increase the likelihood of confusion." *Id.* at 1393. Plaintiffs argues that defendants schedule its seminars at the very same venues and advertise through the same mediums as plaintiffs. Whether this is a result of malfeasance on defendants' part or simply because the amount of venues/advertising streams made available to companies that stage informational seminars on government grants are limited is not ascertainable at this juncture. Thus, while it is possible that defendants' location in the same marketing channels will confuse consumers, it is also possible that the available booking areas are so few and well-defined that there are no other alternatives.

### e. *Type of Goods and Degree of Care Exercised by Consumer*

■ To determine whether there is a likelihood of confusion, courts look to "the reasonably prudent purchaser exercising ordinary caution." *Id.* at 1393. Courts assume that buyers will exercise greater care and sophistication in their purchases when the goods are expensive. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir.1992). Given that the price of plaintiffs' "National Grants Conferences" workshop/membership costs anywhere from approximately $999.00 to $1,900.00,[9] this court will assume that both parties' programs are sufficiently costly to cause consumers to exercise a moderately-high to sophisticated degree of care—thus lessen any likelihood of confusion in making a purchase of the services in question. *See Sleekcraft*, 599 F.2d at 353 (holding

9. Information obtained from internet advertisement website. National Grants Conferences, ProgramReviewer.com, http://www. programreviewer.com/nationalgrants conferences.html (last visited Sept. 17, 2007).

that expensive goods and sophisticated purchasers cut against a likelihood of confusion).

f. *Defendants' Intent in Selecting the Mark*

"[A]n intent to confuse consumers is not required for a finding of infringement." *Brookfield,* 174 F.3d at 1059. However, an intent to deceive is strong evidence of a likelihood of confusion. *Sleekcraft,* 599 F.2d at 354. Plaintiffs argue that defendants deliberately selected their name to confuse consumers and profit from the goodwill that plaintiffs have established over the past nine years. Although defendants were undoubtedly aware of plaintiffs' mark, there is no evidence linking defendants to any intentional deception in the selection of its mark. Moreover, because defendants' mark is not sufficiently similar to that of plaintiffs' mark so as to cause a likelihood of confusion all by itself, it is unlikely that defendants would deliberately choose such a mark to confuse consumers.

g. *Evidence of Actual Confusion*

Evidence of actual confusion is strong evidence that future confusion is likely, *Nutri/System,* 809 F.2d at 606, but the absence of such evidence is not dispositive. *Eclipse Assoc., Ltd. v. Data General Corp.,* 894 F.2d 1114, 1118 (9th Cir.1990). Plaintiffs provide several purported instances of both vendor and consumer confusion. However, most if not all of the vendor "confusion" is traceable to administrative error stemming from the presence of former plaintiffs' employees now situated with defendants rather than perceived similarities of the respective marks. Likewise, plaintiffs fail to show that any professed customer "confusion"—e.g., that a given customer believes he or she may have attended one of defendants' seminars

previously despite it being defendants' first seminar in that area—is attributable to the similarity of the parties' marks rather than the more cognizable similarity in their overlapping function as providers of governmental grant information. Thus, plaintiffs are unable to establish convincing evidence of actual confusion.

h. *Likelihood of Expansion of the Parties' Product Lines*

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft,* 599 F.2d at 354 (citation omitted). When goods are closely related, significant expansion is likely to result in direct competition. Though defendants' company is admittedly in its infancy, neither party provides the court with evidence of an intention to expand the product lines or programs involved. Thus, this factor is neutral.

Upon consideration of all the relevant factors, plaintiffs have not sufficiently demonstrated a likelihood of confusion. Although some of the factors are either neutral or weigh in plaintiffs' favor, the court finds that plaintiffs have not made the most crucial showings specific to this case—that the marks are confusingly similar, proof of intent in selecting the mark, and a low degree of care exercised by consumers. *See Brookfield,* 174 F.3d at 1054 ("Some factors are more helpful than others, and the relative importance of each individual factor will be case specific."). Given these deficiencies, plaintiffs have a stronger need to demonstrate evidence of actual confusion, which they do not. Because the court finds that plaintiffs cannot establish a likelihood of success on the merits of the claim, the presumption that

irreparable harm exists is rebutted. Further, any harm that does exist is either negligible or favors defendants. *See supra* n. 6. Accordingly, the court will deny plaintiffs' Motion for a Preliminary Injunction on its trademark infringement claim.

### C. *Bond*

As a condition of issuing a preliminary injunction, the court must require that the plaintiff post security in an amount which the court deems proper. Fed. Rule Civ. Proc. 65(c). Particularly in light of the amounts defendants have expended on advertizing and other losses they can be expected to incur if enjoined from conducting their upcoming scheduled seminars, defendants suggest a bond in the range of $500,000 to $1,000,000 would be appropriate. Plaintiffs, on the other hand, argue that many of the costs of planned seminars can be avoided by cancellations, and suggest that a bond of $100,000 or less would be appropriate.

Considering all of the facts presented, in light of the fact that the court has not enjoined defendants from conducting their seminars altogether, but only from using certain books, the court finds that a reasonable sum to require plaintiffs to post as bond would be $250,000.

IT IS THEREFORE ORDERED that:

(1) plaintiffs' motion for preliminary injunction on its copyright claim with respect to the Brown Books be, and the same hereby is, GRANTED;

(2) plaintiffs' motion for preliminary injunction on its copyright claim with respect to the Red Books be, and the same hereby is, DENIED;

(3) plaintiffs' motion for preliminary injunction on its copyright claim with respect to the Summary of Services page be, and the same hereby is, DENIED;

(4) plaintiffs' motion for preliminary injunction on its trademark claim be, and the same hereby is, DENIED;

(5) upon the posting by plaintiffs of security in the amount of $250,000, defendants and their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them, shall not use, sell, or market its counterpart material to plaintiffs' Brown Books; and

(6) this preliminary injunction shall take effect immediately and shall remain in effect until otherwise ordered by this court, or until final judgment is entered in this case.